JIJONES, Judge.
Defendants, Ben A. Seale and Merita K. Seale[1], appeal the trial court’s judgment finding that the action of the Board of Directors of Lakewood Homeowners Association, Inc., “Homeowners Association”, did not constitute a breach of the homeowners’ covenants. We reverse the trial court’s judgment.
Lakewood Estates is a private subdivision located in Orleans Parish. It is a residential planned community with common facilities provided for the benefit of the owners and occupants of the community. The common facilities of Lakewood Estates are maintained and administered by the Homeowners Association. Membership in the Homeowners Association is appurtenant to and may not be separated from ownership of a lot in Lakewood Estates.
The contractual agreements by and between the lot owners of Lakewood Estates and the Homeowners Association which govern the respective obligations of each are contained in the following documents: The Act of REstablishment of Servitudes Restrictions and Privileges by Lakewood Estates Development Corporation, “the Act of Establishment”; the Articles of Incorporation of the Homeowners Association, “Articles of Incorporation”; and the By-laws of the Homeowners Association, “the By-laws”. The Homeowners Association is charged with the duty of enforcing the provisions of the Act of Establishment, the Articles of Incorporation, and the By-laws. The Act of Establishment, the Articles of Incorporation, and the Bylaws are hereafter collectively referred to as the “covenants”. The Management of the Homeowners Association is vested in an elected Board of Directors who in turn elect officers to manage daily operations.
Twice a year, to acquire funds to meet its duty of maintaining the common facilities, the Homeowners Association collects monthly dues and special assessments established as a charge on each lot respectively in Lakewood Estates. At its inception Lakewood Estates was divided into seventy-seven (77) residential lots. Over the last several years, some lot owners have purchased an additional lot, or a particular fraction thereof, and have resubdivided them in the city records to now comprise one lot. In January of 1989, there were sixty-three (63) legally recognized residential lots in Lakewood Estates. Currently there are sixty (60) lots in the subdivision.
In the second half of 1989, the Homeowners Association calculated the monthly assessment based on sixty-three (63) lots as opposed to the original seventy-seven (77) lots to reflect the changes. It concluded that the assessment formula would be based upon the total number of legal lots existing as of January 1 of each year. Defendants objected to the change of the assessment formula without amendment of the covenants or without seeking the prior written approval of lot owners and refused to pay the resulting increased monthly assessment.
|3In its attempt to collect the monthly maintenance charges called for under the new assessment formula, the Homeowners Association sent demand letters to defendants, filed liens against defendants’ lot, and filed a petition to enforce liens in December of 1992. The trial court ruled in favor of the Homeowners Association, stating:
... The Court’s concluded that based on the covenant the assessments were based on one member, one vote, and one member, one assessment. The testimony was that the budget was based on up-coming expenditures and then divided by the number of lots and the amount collected semiannually, and the Court will find in favor of Plaintiff, Lakewood Estates Homeowners Association, Inc.
From this judgment defendants appeal.
Defendants argue that because membership in the Homeowners Association is ap *19 purtenant to the lot, votes and assessments vary not with members but with the number of lots owned. Defendants rely on a letter from the Homeowners Association’s attorney, Robert M.' Rosenberg, to its Board of Directors that advised the organization of his interpretation of the covenants. Defendants assert that Mr. Rosenberg’s letter indicates that amendment of the covenants must be put to a vote but recommended that since a vote was impractical that the Board could proceed without an amendment. In the remote possibility that a homeowner would legally challenge the minor increase in assessments, Mr. Rosenberg assured the Board that an indemnification clause in the By-laws and Articles of Incorporation insulated them from any directors’ liability.
The Homeowners Association contests that the advisory letter from Mr. Rosenberg concedes that the covenants must be amended. In fact the letter seems to read, as the trial court interpreted it, that the covenants express that all homeowners should contribute equally towards the maintenance of the Ucommon grounds. The Homeowners Association submits that the original seventy-seven (77) lots were of varying shapes and sizes. There is no basis to assume that the number seventy-seven (77) had any significance. The Homeowners Association insists that this number was merely exemplary. It merely reflected the number of homeowners at the time.
The language of the covenants did not anticipate a situation like the present, where less than seventy-seven (77) lots exist. A thorough review of all the documents reveals that each contains references to seventy-seven (77) lots. In the Act of Establishment the last paragraph under provision VII, “The Homeowners Association”, Section 2 “Voting Rights in the Homeowners Association”, reads as follows:
Solely for the purpose of determining voting rights of Declarant, its successors or assigns there are seventy (77) lots [sic] in the subdivision which are subject to this Declaration. However, nothing herein shall be construed as an obligation on the part of the Declarant, its successors or assigns, to retain control of the Homeowners Association for a given period of time.
The Act also defines the manner in which assessments shall be imposed under provision VIII, “Obligation for Monthly Maintenance Charges and Special Assessments”, number 2, which reads in pertinent part:
Monthly maintenance charges or special assessments shall be levied by the Board of Directors of the Association exclusively to promote the recreation, health, safety and welfare of the residents.... All monthly maintenance charge [sic] and special assessments must be equally imposed on all lots and said ratio shall not be changed without the prior written approval of every lot owner and every holder of a first mortgage on a lot....
Emphasis added.
The Articles of Incorporation contain several references to seventy-seven (77) lots. Under Article II “Definitions”, Section C defines “lot” as any one of | sthe seventy-seven lots comprising the property. Section G defines “property” as the seventy-seven (77) lots in Lakewood Country Club Estates. Article V, “Membership”, Section E provides:
Voting by the members of the Association in the affairs of the Association shall be on the following basis:
One (1) vote per Lot. Seventy-seven (77) total votes.
In reference to “Assessments and Funds” under Article XIII, the term “owners” is used, but a specific number of owners is not mentioned. However, an expression of intent can be gleaned from the references to common surplus and distribution of common surplus upon dissolution or final liquidation— sections C and D. These sections provide that the benefit from and distribution of common surplus funds shall be in proportion to the percentage of their ownership of lots.
Finally, the By-laws also has several references to seventy-seven (77) lots. Article 1, “Members — (Lot Owners)”, section 1, “Eligibility”, enumerates seventy-seven (77) lots to identify lot owners. Section 6, “Voting”, provides that the aggregate number of votes will be seventy-seven (77) to correspond with the number of lots. Under Article IV, Section 2, *20 “Assessments”, no specific number is mentioned but the language reflects that lot owners contribute equally to the annual budget on a monthly basis.
Defendants urge that by virtue of these documents the original seventy-seven lot owners had the expectation that the division of expenses would always be in seventy-seven (77) parts. Whether such an expectation is realistic or reasonable is not for this Court to decide. Our review is limited to whether the documents themselves support defendants’ interpretation that the division of expenses would always 'be in seventy-seven (77) parts.
|6We do not find the language of any of the documents to be explicit, which is the threshold issue in contractual interpretation. Whenever the number seventy-seven (77) is used it is used in provisions relative to voting to define lots or members. However, the language relative to assessments appears to relate back to the provisions identifying lot owners/members. Therefore language such as “equally imposed” or “in proportion to the percentage of their ownership of Lots” or “proportionate share of common expenses” could be interpreted to mean assessments shall be imposed proportionate to ownership of the original seventy-seven (77) lots. Thus, when members re-subdivided lots the Board was obliged to seek the written approval of members before adjusting the ratio for determining assessments or put the issue to a vote.
La.C.C. article 2057 provides that the rule of strict construction applies only in case of doubt that cannot be otherwise resolved. In such an instance the contract is interpreted against the obligee and in favor of the obligor of a particular obligation. We find that these covenants are so dubious that the rule of strict construction should apply in this case and operate in favor of defendants.
For the foregoing reasons the trial court’s judgment is reversed.

REVERSED.

. Merita K. Seale, the wife of Ben A. Seale, was added as a party defendant by amended petition.